ST. PAUL TRUST AND SAVINGS BANK, a Corporation, Respondent, v. JOURGEN OLSON, Clara Olson, Frank T. Sheean, Louis H. Burrell, N. J. Pierce, Farmers State Bank of Wenona, Illinois, a Corporation, Peoples Savings Bank of Spencer, Iowa, a Corporation, Central Metropolitan Bank of St. Paul, Minnesota, a Corporation, and A. C. Knight, Defendants, and JOURGEN OLSON, Appellant.

(198 N. W. 468.)

**Mortgages — evidence held to sustain finding that deeds given as mortgages.**

Plaintiff and respondent brought an action to foreclose certain collateral consisting of bank stock, commission mortgages, and deeds to North Dakota lands claimed to have been given to it as security on account of a loan. The defendant and appellant, Jourgen Olson, resisted the foreclosure for the alleged reason that the deeds were not given to the appellant as security for the loan in question; that they had been wrongfully retained and recorded by respondent, and counter-claimed for damages occasioned by reason of such retention and recording. The trial court found for the plaintiff and respondent, ordered a foreclosure of the deeds in question as mortgages, and dismissed the counter-claim. *Held*, on a trial de novo and for reasons stated in the opinion, that the deeds in question were in fact given as mortgages.

Opinion filed April 17, 1924.

Mortgages, 27 Cyc. pp. 992 n. 75; 1025 n. 45.

Appeal from the District Court of Ward County, *Lowe*, J.

From a judgment of foreclosure, the defendant, Jourgen Olson, appeals.

Affirmed.

*McGee & Goss*, for appellant.

It must be conceded that the plaintiff has the burden of establishing such deeds to be mortgages. We contend that this burden is not met by the plaintiff. No fair preponderance rule governs. Instead, the rule announced in Jasper v. Hazen, 4 N. D. 1, 58 N. W: 454.

"It is quite generally agreed that it is broader in meaning than the word 'contract,' and includes torts; otherwise it would not have been

employed. . . . 'Transaction' comprehended within the meaning of the case is not limited to the facts set forth in the complaint but includes the entire series of acts and mutual conduct of the parties in business proceeding between them which forms the basis of the agreement, and if the plaintiff omits or fails to set forth in his complaint the entire transaction out of which the claim arises, the defendant may supplement this omission by setting forth in his answer the omitted facts so that the entire transaction may be before the court." 24 R. C. L. 844, ¶ 50.

"The result is that to-day it is practically a unanimous rule that counterclaims in tort may be interposed in actions of contract when they fulfill the qualifications of the statute. The construction is based on the counterclaim statutes which commonly satisfy three things as possible basis for a counterclaim, viz.: The contract sued on; the transaction set forth; and the subject of the action. The elementary rules of interpretation require that some definite significance be given to these terms and if they are definite and distinct, then counterclaims may exist, which do not sound in the contract. Accordingly, when a cause of action in favor of the defendant arises from a 'transaction' set forth as the foundation of the plaintiff's claim *it is pleadable as a counterclaim,* no matter what its technical soundings or those of the plaintiff's demand may be. So it has been held that a counterclaim for losses sustained by the maker of a note through negligence of the party caring for the securities pledged to secure the payment of the note, arises out of the transaction connected with the subject of the action thereof upon the note. And in an action on notes secured by a mortgage on personal property a counterclaim for the conversion of the mortgaged property through an attempted foreclosure which does not comply with the statute, has been decided to arise out of the transaction sued upon." 24 R. C. L. 826, under ¶ 33.

*Flynn, Traynor & Traynor* and *C. R. Beddall,* for respondent.

"A point or question is in issue in an action in such a sense that it will be concluded by the judgment therein when an issue concerning it is directly tendered by the pleading in the case." Reinkey v. Wilkins (Wis.) 179 N. W. 751.

"It is a general rule that a judgment is conclusive between the parties and their privies upon all matters embraced within the issues

in the action which were or might have been litigated therein. It is immaterial whether issues are joined by an answer to the complaint or tendered by the plaintiff and left unanswered." Tax Lien Co. v. Schultze (N. Y.) 106 N. E. 751.

"Judgment in a former suit between the same parties is res judicata in a pending suit as to every issue which might have been decided or litigated within the issues in the former suit. . . . The general rule is that the judgment in the former action settled all matters in controversy involved in the issues between the parties to the action; *that is, all matters litigated, or which might have been litigated within the issues as they were made or tendered by the pleadings."* United Oil & Gas Co. v. Ellsworth (Ind.) 88 N. E. 362.

"It is not now open to defendants to assert *what is obviously untrue in fact,* that the deeds were left only in connection with a bond issue." Roarty v. McDermott (N. Y.) 41 N. E. 30.

"The facts in issue in a former action must be determined from the pleadings, in determining as to what matters are res judicata." Williams v. Harrison (Ind.) 123 N. E. 245.

"It is well settled that a question of fact once at issue and tried in a former action may not be retried in a subsequent action between the same parties." Stead v. Manhart (N. D.) 185 N. W. 1110.

"The weight of authority is that the fact that a conveyance is withheld from record or is otherwise concealed is a badge of fraud, especially where this is done in accordance with an agreement to do so, since *this is calculated to give the debtor a delusive or fictitious credit."* 27 C. J. 490 (# 142).

NUESSLE, J. Plaintiff and respondent brought this action to foreclose certain collateral claimed to have been given to it by the defendant Jourgen Olson as security on account of a loan of $75,000. This collateral consisted of bank stocks, second (commission) mortgages, and deeds to North Dakota lands. The defendant Olson resisted the foreclosure for the alleged reason that the deeds were not given to the plaintiff as security for the loan in question; alleged that the deeds had been wrongfully retained and recorded by the plaintiff, and counterclaimed for damages occasioned to the defendant by reason of such recording. The trial court found for the plaintiff, ordered judgment in

its favor for $89,878, the amount claimed, and costs, and for the foreclosure of the deeds in question as mortgages, and dismissed the counterclaim. Judgment was entered accordingly. From this judgment the defendant Jourgen Olson appealed, demanding a review of the entire case and a trial de novo thereof in this court.

The appellant specifies numerous errors, but in his briefs and on oral argument grounded his case upon two propositions only; first, that the deeds, the foreclosure of which was prayed by the respondent, were not security for the loan in question and were held and recorded by the respondent as such without the consent and against the demands of the appellant; and second, that the court erred in dismissing the counterclaim for damages. No question is raised as to the amount of the judgment; and the appellant concedes, and we think rightly, that if the first proposition above set out be decided adversely to his contention, and the holding of the trial court be affirmed in that regard, that it necessarily follows that the action of the trial court in dismissing the counterclaim was proper, and the second proposition advanced on this appeal must fall. We will, therefore, first give attention to the proposition that the deeds were not security for the debt for which judgment was ordered, and that they were held and recorded by the respondent as such without the consent and against the demands of the appellant. This proposition is concerned with and depends upon matters of fact rather than matters of law.

It appears from the record that the respondent bank is a corporation engaged in the banking business in the city of St. Paul, Minnesota. The appellant Jourgen Olson is a resident of Minot, North Dakota, and has for many years been engaged in the banking and investment business. He prospered in that business, and at the time of the transactions involved here was rated as a very wealthy man, the owner of much property, including a great deal of North Dakota land. In May, 1921, appellant was desirous of obtaining a loan. He had long been acquainted and friendly with Grant Van Sant, an officer of the respondent bank. He entered into negotiations with respondent through Van Sant with the purpose of floating a bond issue secured by his North Dakota real estate. Some preliminary negotiations were had. Van Sant advised that he thought the bond issue could be floated. Appellant deposited $150 with the plaintiff to cover the preliminary ex-

pense attendant upon an inspection of the lands. Before they could be inspected, however, appellant advised that he desired to hold off the transaction. A few days thereafter he went to St. Paul, saw Van Sant and negotiated a short time loan with the respondent in the amount of $75,000 payable in six months, with interest at eight per cent to be paid in advance. Concerning the matters thus far stated, there is no dispute. The dealings relating to the matters out of which this suit arises were had in the main between Olson and Van Sant. Both concede that at the time the loan was made Olson furnished as collateral security therefor bank stock of a par value aggregating something over $100,000 and second mortgages on real estate of the face value of $75,000. Olson also executed and delivered to respondent deeds to some seven thousand acres of North Dakota farm land. He contends that these deeds were delivered to and were to be held by the respondent only in connection with the proposed bond issue. Van Sant, who received the deeds for the respondent, contends that the deeds were executed and delivered as further collateral security for the $75,000 loan, and not in connection with the proposed bond issue. Out of this difference between these parties grew this action.

On the trial of the cause in the district court, both Olson and Van Sant were called as witnesses, and testified before the court. Olson testified that the deeds in question were given in connection with the bond issue in May; that they had nothing to do with the short time loan; that such loan was completed about June 10th; that Olson was interested in numerous banks in North Dakota and Minnesota; that there was an arrangement between him and Van Sant whereby the respondent bank was to be used as a reserve bank by Olson's institutions, and $60,000, reserve of such institutions, was to be carried in the respondent bank; that a written memorandum to this effect was signed; that Olson's banks deposited accordingly; that shortly thereafter there was an examination of the respondent bank by a bank examiner; that inadvertently such written agreement was disclosed to such examiner; that such examiner protested the arrangement; that it then appeared that the respondent bank was not a proper reserve bank, and could not be used as such; that the examiner learned of the fact that the deeds in question were held by the respondent; that he insisted that they be placed of record; that Van Sant came to Minot to

see Olson with reference to the matter, and asked that he be permitted to place them of record; that Olson advised that his credit would be injured if that were done, and insisted that under no circumstances should they be placed of record; that at the time the $75,000 loan was made, he demanded the return of such deeds, but was put off by Van Sant, who promised to return them later, but failed and refused to do so; that subsequently and without Olson's knowledge, such deeds were placed of record; that Olson did not learn of such fact until advised by the bank examiner of North Dakota on October 20th; that his credit was injured by reason of the recording of the deeds, and he was unable to pay the $75,000 loan when the same matured; that subsequently an arrangement was entered into whereby it was renewed; that during all of this time the bond issue negotiations were continuing, and for that reason the deeds were permitted to remain with the respondent.

On the other hand, Van Sant testifies that the deeds in question were not given in connection with the bond issues; that they were executed and delivered on the day when the $75,000 loan was made and as security therefor; that he as the representative of the respondent bank had advised Olson that such security would be required, and the loan would not be made without the same, but that there was an understanding that they should not be recorded; that there was an agreement between Olson and Van Sant as to the keeping of $60,000 in the respondent bank as reserve by Olson's institutions; that the authorities ruled that the respondent was not a proper reserve bank; that the agreement was seen by a bank examiner and exception taken thereto, and demand made that the deeds be recorded; that Van Sant went to Minot to see Olson to get his consent to record the deeds; that at such time the agreement as to the deposit of the $60,000 was destroyed, and Olson consented to the recording of the deeds; that in accordance with such consent they were recorded; that Olson agreed to pay the taxes on the lands in order to permit recording, but that he failed to do so; that Olson was unable to pay the loan on November 26th when the same matured; that subsequently and in January, 1922, Van Sant again went to Minot, saw Olson with reference to the matter, and extended the loan until March on condition that further security be given by Olson; that Olson failed to pay on the extended due date, and this action was thereafter begun.

Other witnesses were called whose testimony tended to corroborate Van Sant's version. Olson's testimony stands alone, except for such corroboration as it may have from the circumstances. The trial court who had the advantage of hearing and seeing the witnesses accepted Van Sant's version of the transaction, and found accordingly. Counsel for the appellant strenuously contends that while on the face of the record there is that which to some degree tends to sustain this finding of the trial court, nevertheless in view of the fact that there unquestionably were negotiations touching the floating of a bond issue and the very great discrepancy between the amount of the loan made and the value of the collateral furnished outside of the deeds, that this court should find to the contrary.

Heretofore, we have said nothing as to the evidences of the real transaction made by the parties as the same progressed. It seems to us that in view of the direct conflict in the testimony of the principal witnesses that those evidences must determine where the truth lies. In the first place, Olson testifies that the deeds were given preliminary to the bond issue; that the $75,000 loan was not made until the 10th of June, while the deeds were executed and delivered in May. But in what direction do all the straws point? The deposit of $150 was made as an initial step in the transaction. This was paid May 19th. The telegram from Olson advising that the examination should be delayed was dated May 21st. The deeds were dated and acknowledged on May 27th. The loan was to be for six months. It was subsequently renewed, the renewal papers being dated November 26th. It appears that the proceeds of the loan were deposited to Olson's credit in the respondent bank on May 27th, the date of the execution of the deeds. He had no account therein prior to that time. From the ledger sheet of the respondent bank it appears that Olson drew checks on this account and the respondent paid the same in an aggregate amount of almost $50,000 prior to June 10th. Thus far these evidences, which palpably could not have been fabricated, sustain Van Sant's version of the transaction.

The loan was evidenced by fifteen notes for $5,000 each. Each of these notes contains a recital that it is secured "By certain bank stock, commission mortgages and *an unrecorded deed* delivered to the St. Paul Trust & Savings Bank as of this date." This recital is sep-

arately signed by Olson. Olson admits the signature, but says that the recital was filled in subsequently. Van Sant testifies to the contrary. There is also in evidence a letter dated June 2nd written by the respondent to Olson which, after referring to the transaction, to the bank stock, and to the commission mortgages received as collateral, recites: "We are also sending you a receipt of the two unrecorded deeds. Please also sign the receipt and return to us. *In this way we will have receipts of all three of the collateral items which you left here.*" It appears from the testimony that the receipt referred to was sent to Olson with this letter; that it was signed by Olson without comment or objection, and returned, and is as follows:

"June 2nd, 1921.

"We acknowledge receipt of two warranty deeds as collateral security to loan of Jourgen Olson, one covering 6240 acres in Ward County, North Dakota, the other covering 880 in Renville County, North Dakota, represented to be clear of encumbrance, and value approximately at $40.00 per acre or a total of $284,000.

"Receipt of above deeds as collateral acknowledged.

"St. Paul Trust and Savings Bank
"By E. H. Hinsch

"Receipt of above receipt acknowledged.

"Jourgen Olson."

Again these evidences sustain Van Sant's version. In July Van Sant went to Minot to see Olson with reference to the matter of recording the deeds. Olson concedes the visit. He disagrees with Van Sant as to the date. Van Sant says that Olson agreed that the deeds might be recorded. Olson denies this. Certainly, however, it was in July. However, it appears that on August first the respondent wrote Olson that the deeds had been sent for record; that respondent would like to have him arrange to pay the taxes on the lands, if necessary so to do *in order to have them recorded in accordance with his agreement made in Minot.* And again, on August 2nd respondent wrote him that the deeds had been sent but returned on account of unpaid taxes, and asked him to send check for such taxes so that the same might be paid and the deeds recorded. And again, on August 30th respondent wrote

Olson advising that the taxes were still unpaid and the deeds unre-corded, and that the registers of deeds were holding the same until such payments could be made. And again, on August 31st the bank wrote, sending statement of taxes to be paid, and advising that the deeds were at the offices of the registers of the deeds awaiting the payment there-of. To none of these letters does it appear that Olson made any reply, protesting against recording the deeds, or otherwise, excepting that on August 29th he wrote saying, "Now I do not want you to understand that I object to your filing the deeds. . . . I would be perfectly willing to have the deeds recorded if it would not hurt one way or the other. Again, it might hurt you as much as it might hurt me. So you think this matter over and let me know." To this letter the respondent replied, calling attention to Olson's promise to permit the recording of the deeds, and advising that it would be necessary to record them. Yet no further word of protest or objection from Olson. The taxes were not paid, and the deeds not recorded. On September 26th respondent wired Olson, "Directors order taxes advanced and deeds recorded im-mediately. Is there no alternative?" Nor did Olson reply to this, and finally on October 11th respondent advanced the taxes, and the deeds were recorded. Subsequently, when the original obligation was re-newed, Olson gave his note for the amount of these taxes. Surely the only reasonable construction that can be put upon this correspondence and Olson's attitude with respect to the same is in accordance with the testimony of Van Sant that the deeds were collateral to the loan and were to be recorded.

The loan matured on November 26th. It was not paid. The re-spondent pressed for payment, and finally on January 21, 1922, Van Sant again went to Minot accompanied by his attorney, saw Olson, and an arrangement was made whereby the date of payment was extended until March 15th. Olson at that time signed a new note for $75,000, and an additional note for $6,000 for taxes on the lands in question paid by the respondent in order to permit the recording of the deeds, and for other items of expense in connection therewith; and also signed a written agreement touching the matter in which he stipulated to take steps to clear the title to certain of the lands which were encumbered, and also to give certain other deeds which he did in fact give. Olson testifies in explanation of this agreement that he did sign it but under

a misapprehension and hurriedly. The extension notes given on January 21st were identical in form with the fifteen original notes, and contained similar recitals signed by Olson, that he was giving as collateral thereto "deed to 6,800 acres of land in North Dakota, assignment of about $72,000 of commission mortgages and about 800 shares of bank stock." The loan was not paid on the extended date, March 15th, 1922, and thereafter this suit was begun.

We are of the opinion, after a careful examination of the record in this case, including of course the exhibits offered and a part thereof, that there cannot be the slightest doubt but that the deeds in question were given as collateral security to the $75,000 loan as contended by the plaintiff. The evidence is more than ample to sustain the findings of the trial court, and there is no reason why they should be in any way disturbed. It follows that the action of the trial court in dismissing the counterclaim was right. The judgment is in all things affirmed.

The judgment in this case was entered on October 27th, 1923. A special execution was issued thereon and delivered to the sheriff on November 4th, 1923. Under such special execution the sheriff advertised all the stock certificates and promissory notes foreclosed upon, the sale being advertised to be held on December 22nd, 1923. On December 15th, 1923, the trial judge upon the application of the appellant entered an order staying execution and directing that no sale be had and recalled the execution. Thereafter on December 20th, 1923, a district judge of an adjoining district, sitting at the written request of the trial judge in this case, entered an order vacating the stay order issued on December 15th, 1923, and directed that the sale be adjourned until January 21st, 1924, and that it then be had as advertised unless the appellant furnished a bond in the sum of $20,000, conditioned as provided in such order. The additional bond was not furnished and the sale of the personal property was had according to the advertisement. Thereafter the sheriff advertised the real property to be sold. On January 30th, 1924, pursuant to notice, the trial judge upon the application of the appellant made an order staying all proceedings pending the determination of the cause on appeal and further directed that all the securities sold on the sale held January 21st, 1924, be impounded and held by the clerk of the district court pending the determination of the appeal. In such order the trial court fixed the amount

of a stay bond, which the appellant furnished. Thereafter on February 15th, 1924, pursuant to notice, the plaintiff applied to this court for an order vacating the last mentioned order of the trial court. Such application was argued before this court on that day. No decision was made upon the merits of the application to vacate the stay order; but this court advanced the cause upon the calendar so as to afford a speedy determination of the cause on the merits thereof. Upon the argument of such application, however, plaintiff's counsel asked that this court preserve the status of the then pending notice of sale, and accordingly this court ordered that the date of the sale be continued until April 19th, 1924.

In view of all the circumstances we have grave doubts if a sale of the real estate held pursuant to the original notice of sale would be likely to bring about a proper attendance and desirable bids at the sale. Hence, it is the order of this court that if the appellant so desires he may apply to the district court forthwith for the publication of a new notice of sale of the real property, and, also, for a vacation of the sale of the personal property, and a new sale thereof. And if such a sale be ordered of either the personal or real property or both of such personal and real property, that it be had in such manner, and the property be sold in such parcels and pieces as will bring the best possible price; and to that end the trial court afford the parties an opportunity to make such showing as they desire as to the manner in which the sale be had, and after such hearing the trial court make such further order in regard thereto as is meet and just in the premises, having due regard to the rights of all parties affected. It is further ordered that the remittitur be forthwith transmitted to the trial court.

BRONSON, Ch. J., and BIRDZELL, CHRISTIANSON, and JOHNSON, JJ., concur.